Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HANY MORSY, derivatively on behalf of MULLEN AUTOMOTIVE, INC., | Case No. |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| DAVID MICHERY, IGNACIO NOVOA, MARY WINTER, KENT PUCKETT, MARK BETOR, WILLIAM MILTNER, JONATHAN NEW, JERRY ALBAN, and OLEG FIRER, | |
| Defendants, | |
| and | |
| MULLEN AUTOMOTIVE, INC., | |
| Nominal Defendant. | |

– 1 –
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Hany Morsy ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Mullen Automotive, Inc.[1] ("Mullen" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants David Michery, Ignacio Novoa, Mary Winter, Kent Puckett, Mark Betor, William Miltner, Jonathan New, Jerry Alban, and Oleg Firer (collectively, the "Individual Defendants" and with Mullen, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Mullen, gross mismanagement, abuse of control, waste of corporate assets, and violation of Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"). As for his complaint against Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of Defendants' public documents and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Mullen, news reports, securities analysts' reports and advisories about the Company, the proceedings in the consolidated action styled *In re Mullen Automotive, Inc. Securities Litigation,* Case No. 2:22-cv-3026-DMG-AGR (N.D. Cal.) (the "Consolidated Securities Class Action"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

---

[1] In November 2021, Mullen Technologies, Inc. ("Mullen Technologies") and Net Element Inc. ("Net Element") closed a merger which resulted in Mullen Automotive, Inc. (the "Merger").

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NATURE OF THE ACTION

1.     This is a shareholder derivative action which seeks to remedy wrongdoing committed by Mullen's directors and officers between June 15, 2020 and April 6, 2022, inclusive (the "Relevant Period").

2.     Nominal Defendant Mullen is a Southern California-based automotive company building the next-generation of premium electric vehicles ("EVs") that are affordable and built entirely in the United States. Nominal Defendant Mullen touts its end-to-end ecosystem that supports owners from test driving to financing and servicing through a unique hybrid dealership model wherein customers are supported through every aspect of EV ownership.

3.     Throughout the Relevant Period, the Company was caused to issue false and/or misleading statements regarding its ability and timeline for production of vehicles, its deals with business partners such as Qiantu Motor Ltd. ("Qiantu"), its battery technology and capabilities, its ability to sell branded products, its due diligence into Mullen Technologies, Inc., and that the Dragonfly K50 was not solely delayed due to the COVID-19 pandemic.

4.     On April 6, 2022, market analyst Hindenberg Research released a report regarding the Company entitled "Mullen Automotive: Yet Another Fast Talking EV Hustle" which detailed several alleged issues with the Company (the "Hindenburg Report").

5.     Mullen's stock price declined upon these revelations. The loss of reputation and goodwill is severe as well.

## JURISDICTION AND VENUE

6.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

– 3 –

7.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is a citizen of California or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

8.     Subject matter jurisdiction is also conferred by 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

9.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367(a).

10.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

11.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

12.     Plaintiff is a current shareholder of Mullen. Plaintiff has been, and continues to be, a shareholder of Mullen common stock during the Relevant Period. Plaintiff is a resident of Pennsylvania.

13.     Nominal Defendant Mullen is a Delaware corporation with its head office is located at 1405 Pioneer Street, Brea, California 92821. Nominal Defendant Mullen purports to be an electronic vehicle ("EV") manufacturer. On November 5,

– 4 –

2021, Mullen Technologies, Inc. ("Mullen Technologies") underwent a merger with Net Element, Inc., ("Net Element") and the Company changed its name to Mullen Automotive, Inc. (the "Merger"). The Company's shares trade on the NASDAQ exchange under the ticker symbol "MULN." Prior to the Merger, the Company's shares traded under the ticker symbol "NETE.".

14.     Defendant David Michery ("Michery") has served as the Chief Executive Officer ("CEO") and Chairman of the Board of Directors of the Company following the Merger. Prior to the Merger, Defendant Michery served as the CEO of Mullen Technologies. On information and belief, Defendant Michery is a resident of California.

15.     Defendant Ignacio Novoa ("Novoa") has served as a Director of the Company since July 1, 2022. Defendant Novoa and the Company entered into a one-year Consulting Agreement on January 12, 2022. On information and belief, Defendant Novoa is a resident of California.

16.     Defendant Mary Winter ("Winter") has served as a Director of the Company since the closing of the Merger and previously she served as a Director of Mullen Technologies since 2018. Defendant Winter currently serves as the Secretary of the Company and Board of Directors. Formerly, she was the Vice President of Operations for Mullen Technologies since 2014. On information and belief, Defendant Winter is a resident of California.

17.     Defendant Kent Puckett ("Puckett") has served as a Director of the Company since 2018, serving as the Audit Committee Chair during that time. Defendant Puckett served as a Director of Mullen Technologies' since 2018, serving as the Audit Committee Chair during that time. Previously, he served as the Chief Financial Officer of Mullen Technologies from 2012 to 2018. Defendant Puckett is the Chair of the Compensation Committee and a member of the Audit and

Nominating and Governance committees. On information and belief, Defendant Puckett is a resident of California.

18.     Defendant Mark Betor ("Betor") has served as a Director of the Company since the closing of the Merger and previously served as a Director of Mullen Technologies since 2018, serving on the Compensation Committee of Mullen Technologies. Defendant Betor is also a member of the Audit and Compensation committees, and Chair of the Nominating and Governance Committee. On information and belief, Defendant Betor is a resident of California.

19.     Defendant William Miltner ("Miltner") has served as a Director of the Company since the closing of the Merger. Defendant Miltner is a member of the Nominating and Governance Committee. On information and belief, Defendant Miltner is a resident of California.

20.     Defendant Jonathan New ("New") served as a Director of the Company from the closing of the Merger until September 19, 2022. Defendant New was the Chair of the Audit Committee and a member of the Compensation Committee. Defendant New has served the Company's Chief Financial Officer ("CFO") since September 19, 2022. On information and belief, Defendant New is a resident of Florida.

21.     Defendant Jerry Alban served as the Chief Operating Officer ("COO") and a Director of the Company from the closing of the Merger until June 30, 2022. Defendant Alban held the same position at Mullen Technologies since June 2021. Prior to that position, he served as Chief Financial Officer at Mullen Technologies from April 2018 until November 2021. Defendant Alban also has served as an internal consultant for the Company since January 2018. On information and belief, Defendant Alban is a resident of California.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

22.     Defendants Michery, Novoa, Winter, Puckett, Betor, Miltner, New, and Alban are collectively referred to herein as "Director Defendants."

23.     Defendant Oleg Firer ("Firer") served as the CEO and Executive Director of the Company prior to the Merger. On information and belief, Defendant Firer is a resident of Florida.

24.     The Director Defendants and Defendant Firer are collectively referred to herein as "Individual Defendants." The Individual Defendants with Nominal Defendant Mullen are collectively referred to herein as "Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

25.     By reason of their positions as officers, directors and/or fiduciaries of Mullen and because of their ability to control the business and corporate affairs of Mullen, the Individual Defendants owed Mullen and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Mullen in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Mullen and its shareholders so as to benefit all shareholders equally.

26.     Each director and officer of the Company owes to Mullen and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

27.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Mullen, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

28.     To discharge their duties, the officers and directors of Mullen were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

29.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.

30.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Mullen, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware of posed a risk of serious injury to the Company.

31.     Specifically, the Individual Defendants caused Mullen to issue false and misleading statements of material fact in the Company's public statements, including in its: June 15, 2020 press release entitled "Net Element Enters into a Letter of Intent to Merge with Electric Vehicle Company Mullen Technologies" (the "June 2020 Press Release"); December 15, 2020 press release entitled "NETE: Q3 2020 Revenues Improve Despite Continued Shutdowns in NY and California" (the "December 2020 Press Release"); July 27, 2021 Proxy statement; November 15, 2021 press release entitled "Mullen Automotive Announces It Now Owns Tunica, Mississippi, EV Assembly Plant Free and Clear" (the "November 2021 Press Release"); February 28, 2022 press release entitled "EV Manufacturer Mullen Announces Progress on Solid-State Polymer Battery Pack Development" (the "February 2022"); and tweet from March 17, 2022 (the "March 17, 2022 Tweet").

– 8 –

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

32.     The Individual Defendants' conduct, who were also officers and directors of the Company, has been ratified by the remaining Individual Defendants who collectively comprised Mullen's Board at relevant times. Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing Mullen to issue false and misleading statements of material fact in the Company's statements relating to the Company and its prospects and failed to protect corporate assets.

33.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects including potential purchases, so that the market price of Mullen's stock would be based upon truthful and accurate information. Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing Mullen to make false and misleading statements of material fact in the Company's statements regarding the Merger and the Company's business, before and after closing.

34.     To discharge their duties, the officers and directors of Mullen were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Mullen were required to, among other things:

    a. ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware,

California, the United States, and pursuant to the Mullen's own Code of Business Conduct and Ethics and internal guidelines;

b. conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c. remain informed as to how Mullen conducted its operations and plans, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

d. establish and maintain systematic and accurate records and reports of the business and internal affairs of Mullen and potential acquisitions, procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

e. maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Mullen's operations would comply with all laws and Mullen's statements filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

f. exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

g. examine and evaluate any reports of examinations, audits, or other financial information concerning the affairs of the Company, including potential combinations and purchases, and to make full and accurate

disclosure of all material facts concerning, among other things, each of the subjects and duties set forth above; and

h.  conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

35.    Each of the Individual Defendants further owed to Mullen and the shareholders the duty of loyalty requiring that each favor Mullen's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

36.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Mullen and were at all times acting within the course and scope of such agency.

37.    Because of their advisory, executive, managerial, and directorial positions with Mullen, each of the Individual Defendants had access to adverse, non-public information about the Company and potential purchases including that the Company was caused to issue false and/or misleading statements regarding its ability and timeline for production of vehicles, its deals with business partners such as Qiantu, its battery technology and capabilities, its ability to sell branded products, its due diligence into Mullen Technologies, and that the Dragonfly K50 was not solely delayed due to the COVID-19 pandemic.

38.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Mullen.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

39.    In addition, the Individual Defendants' actions and conduct has subjected the Company to at least the Consolidated Securities Class Action. Additionally, the Individual Defendants' actions caused the Company to issue false and/or misleading statements regarding its ability and timeline for production of vehicles, its deals with business partners such as Qiantu, its battery technology and capabilities, its ability to sell branded products, its due diligence into Mullen Technologies, and that the Dragonfly K50 was not solely delayed due to the COVID-19 pandemic. As a result, Mullen has expended, and will continue to expend, substantial sums of money to rectify the Individual Defendants' wrongdoing as well as lose potential business and goodwill.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

40.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

41.    During the Relevant Period, the Individual Defendants collectively and individually initiated a course of conduct of the Merger despite Mullen Technologies' issues regarding, among other things, its ability and timeline for production of vehicles, its deals with business partners such as Qiantu, its battery technology and capabilities, its ability to sell branded products, and that the Dragonfly K50 was not solely delayed due to the COVID-19 pandemic, and to issue false and misleading statements of material fact that failed to disclose and misrepresented adverse facts that were known to the Individual Defendants or were recklessly disregarded by them at the time they were made, including that the

– 12 –

Individual Defendants caused Mullen to make false and misleading statements of material fact in the Company's statements relating to the Merger before and after closing the deal and also its business. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein.

42.   The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused Mullen to make false and misleading statements of material fact in the Company's statements relating to the Merger and Mullen Technologies' and its own ability and timeline for production of vehicles, its deals with business partners such as Qiantu, its battery technology and capabilities, its ability to sell branded products, its due diligence into Mullen Technologies, and that the Dragonfly K50 was not solely delayed due to the COVID-19 pandemic

43.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (1) disguise and misrepresent the valuation of the Company; and (2) artificially inflate the Company stock price.

44.   Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

45.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment

of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

46.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Mullen and was at all times acting within the course and scope of such agency.

## CODE OF BUSINESS CONDUCT AND ETHICS

47.    The conduct of all of the Company's officers, directors, and employees is governed by its Code of Business Conduct and Ethics (the "Code of Ethics").

48.    The Code of Ethics confirms that the Company's officers, directors, and employees must follow applicable laws, rules, and regulations and engage in honest and ethical business conduct, stating in pertinent part:

> **Purpose**
> ***Mullen Technologies, Inc. (the "Company") is committed to promoting high standards of honest and ethical business conduct and compliance with applicable laws, rules, and regulations.*** As part of this commitment, the Company has adopted this Code of Business Conduct and Ethics (this "Code"). The Company has adopted this Code to set expectations and provide guidance applicable to all members of the Company's Board of Directors (the "directors") and officers, employees, independent contractors, and consultants of the Company (all such persons for purposes of this Code, "employees").
>
> *       *       *
>
> The Company expects all its directors, executives, managers, and other supervisory personnel to act with honesty and integrity, use due care and diligence in performing responsibilities to the Company, help foster a sense of commitment to this Code among its employees and foster a culture of fairness, honesty, and accountability within the Company. The Company also expects such personnel to ensure that the Company's agents and contractors conform to the standards of this Code when working on the Company's behalf.

– 14 –

\*       \*       \*

> ***Anyone who violates the standards in this Code will be subject to
> appropriate action, which, in certain circumstances, may include (a)
> for directors, removal from the Board, legal action or referral for
> criminal prosecution and (b) for employees (other than directors),
> termination of employment or service provider relationship for cause,
> legal action or referral for criminal prosecution.***

(Emphasis added.)

49.    Following the Purpose section, the Code of Ethics' next section is
entitled "LEGAL COMPLIANCE". The Legal Compliance subsection states the
following in pertinent part:

> ***All employees must always obey the law while performing their duties
> to the Company.*** The Company's success depends upon each employee
> operating within legal guidelines and cooperating with authorities. It is
> essential that all employees know and understand the legal and
> regulatory requirements that apply to the Company's business and to
> their specific area of responsibility. While an employee is not expected
> to have complete mastery of these laws, rules and regulations,
> employees are expected to be able to recognize situations that require
> consultation with others to determine the appropriate course of action.
> See Section 18 (Compliance Standards and Procedures) for a
> description of whom to contact with questions about legal compliance.

(Emphasis added.)

50.    Following the Legal Compliance section, the Code of Ethics' next
section is entitled "FINANCIAL INTEGRITY; PUBLIC REPORTING". The
Financial Integrity; Public Reporting subsection states the following in pertinent
part:

> The Company strives to maintain integrity of the Company's records
> and public disclosure. ***The Company's corporate and business
> records, including all supporting entries to the Company's books of***

– 15 –

***account, must be completed honestly, accurately, and understandably.*** The Company's records are important to investors and creditors. ***They serve as a basis for managing the Company's business and are important in meeting the Company's obligations to business partners, suppliers, vendors, creditors, employees, and others with whom the Company does business.*** The Company depends on the books, records and accounts accurately and fairly reflecting, in reasonable detail, the Company's assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

To help ensure the integrity of the Company's records and public disclosure, the Company requires that:
• no entry be made in the Company's books and records that is intentionally false or misleading.

\*      \*      \*

The Company's disclosure controls and procedures are designed to help ensure that the Company's reports and documents filed with or submitted to the U.S. Securities and Exchange Commission (the "SEC") and other public disclosures are complete, fair, accurate, fairly present the Company's financial condition and results of operations and are timely and understandable. Employees who collect, provide, or analyze information for or otherwise contribute in any way in preparing or verifying these reports should be familiar with and adhere to all disclosure controls and procedures and generally assist the Company in producing financial disclosures that contain all the information about the Company that is required by law and would be important to enable investors to understand the Company's business and its attendant risks. These controls and procedures include, but are not limited to, the following:

• no employee may take or authorize any action that would cause the Company's financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules, and regulations of the SEC or other applicable laws, rules and regulations.
• all employees must cooperate fully with the Company's finance department, as well as the Company's independent auditors and legal counsel, respond to their questions with candor and provide them with

– 16 –

complete and accurate information to help ensure that the Company's books and records, as well as its reports filed with the SEC, are accurate and complete; and

*• no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of the Company's reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of such reports accurate in all material respects*.

*In connection with the preparation of the financial and other disclosures that the Company makes to the public, including by press release or filing a document with the SEC, directors must, in addition to complying with all applicable laws, rules and regulations, follow these guidelines:*
*• act honestly, ethically, and with integrity.*
*• comply with this Code.*
*• endeavor to ensure complete, fair, accurate, timely and understandable disclosure in the Company's filings with the SEC.*
*• raise questions and concerns regarding the Company's public disclosures when necessary and ensure that such questions and concerns are appropriately addressed.*
• act in good faith in accordance with the director's business judgment, without misrepresenting material facts or allowing independent judgment to be subordinated by others; and
*• comply with the Company's disclosure controls and procedures and internal controls over financial reporting.*

(Emphasis added.)

51.     Following the Financial Integrity; Public Reporting section, the Code of Ethics' next section is entitled "CONDUCT OF SENIOR FINANCIAL EMPLOYEES". The Conduct if Senior Financial Employees subsection states the following in pertinent part:

Because of this special role, the Company requires that the Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer,

Corporate Controller, and any other persons performing similar functions ("Senior Financial Employees"):

1. Act with honesty and integrity and use due care and diligence in performing their

responsibilities to the Company. …

3. Provide constituents with information that is accurate, complete, objective, relevant, timely and understandable, including information for inclusion in the Company's submissions to governmental agencies or in public statements.

4. ***Comply with applicable laws, rules, and regulations of federal, state and local governments, and of any applicable public or private regulatory and listing authorities.***

5. Achieve responsible use of and control over all assets and resources entrusted to each Senior Financial Employee.

(Emphasis added.)

52.    The Code of Ethics' includes a subsection entitled "PROTECTION AND PROPER USE OF COMPANY ASSETS" which states the following in pertinent part:

All employees are expected to protect the Company's assets and ensure their efficient use for legitimate business purposes. Theft, carelessness, and waste have a direct impact on the Company's business and operating results. Company property, such as computer equipment, buildings, furniture and furnishings, office supplies, products, and inventories, should be used only for activities related to an employee's employment, although incidental personal use is permitted. The Company retains the right to access, review, monitor and disclose any information transmitted, received, or stored using the Company's electronic equipment, with or without an employee's or third party's knowledge, consent or approval. Any theft, misuse or suspected theft or misuse of the Company's assets that becomes known to an employee must be immediately reported.

– 18 –

53.     The Code of Ethics' includes a section entitled "ADMINISTRATIVE MATTERS" which confirms the Audit Chair is the point person for any issues for directors, stating the following in pertinent part:

**8.2 COMPLIANCE STANDARDS AND PROCEDURES**
**8.2.1 Compliance Resources**
The Company has an obligation to promote ethical behavior. Directors are encouraged to talk to the Audit Chair (or, in the case of the Audit Chair, the General Counsel) when in doubt about the application of any provision of this Code, and employees (other than directors) are encouraged to talk to their supervisors, managers and other appropriate personnel (including the General Counsel) when in doubt about the application of any provision of this Code.

*       *       *

For directors, the Audit Chair (or, in the case of the Audit Chair, the General Counsel) is the most immediate resource for any matter related to this Code. For employees (other than directors), the supervisor of an employee is the most immediate resource for any matter related to this Code. Supervisors may have relevant information or may be able to refer questions to another appropriate source. There may, however, be times when an employee prefers not to go to the employee's supervisor. In these instances, employees should feel free to discuss their concern with the General Counsel. If an employee (other than a director) is uncomfortable speaking with the General Counsel because the General Counsel works in the employee's department or is one of the employee's supervisors, please contact the Audit Chair (for matters related to accounting, internal accounting, controls or auditing) or the chair of the Nominating & Corporate Governance Committee (the "Governance Committee") of the Board (for all other matters).

**8.2.2 Clarifying Questions and Concerns; Reporting Possible Violations**
If a director encounters a situation or is considering a course of action and its appropriateness is unclear, the director should discuss the matter promptly with the Audit Chair (or, in the case of the Audit Chair, the General Counsel).

If an employee encounters a situation or is considering a course of action and its appropriateness is unclear, the employee should discuss the matter promptly with the employee's supervisor or the General Counsel. Even the appearance of impropriety can be very damaging to the Company and should be avoided. If an employee is aware of a suspected or actual violation of this Code by others, it is the employee's responsibility to report it. Reporting procedures, including anonymous reporting procedures, are described in the Whistle-Blower Policy and Procedures available on the Company's internal website. Employees should raise questions or report potential violations of this Code without any fear of retaliation in any form; it is the Company's policy not to retaliate in such circumstances and the Company will take prompt disciplinary action, up to and including termination of employment or service provider relationship for cause, against any employee who retaliates against the reporting employee.

Supervisors must promptly report any complaints or observations of Code violations to the General Counsel. The General Counsel will investigate all reported possible Code violations promptly and with the highest degree of confidentiality that is possible under the specific circumstances. As needed, the General Counsel will consult with the Human Resources department, the Audit Committee, the Governance Committee and outside counsel, as appropriate.

If the investigation indicates that a violation of this Code has probably occurred, the Company will take such action as it believes to be appropriate under the circumstances. If the Company determines that an employee is responsible for a Code violation, the employee will be subject to disciplinary action up to, and including, termination of employment for cause and, in appropriate cases, civil action or referral for criminal prosecution. Appropriate action may also be taken to deter any future Code violations.

### 8.2.3 Responsibility for the Investigation

***The Board is ultimately responsible for the investigation and resolution of all suspected or actual violations of this Code. Alleged violations of this Code will be investigated by the Audit Committee***

***and may result in discipline and other action at the discretion of the Board upon recommendation of the Audit Committee, including, where appropriate, removal from the Board.*** The Board and the Audit Committee will conduct their investigations with the highest degree of confidentiality that is possible under the specific circumstances. The Audit Chair, the Audit Committee or the General Counsel may consult with other members of the Board and outside counsel as appropriate.

\*        \*        \*

**8.4 ADMINISTRATION OF THIS CODE**
The Audit Committee is responsible for reviewing this Code as set forth in the Audit Committee's charter and overseeing the establishment of procedures for the prompt internal reporting of violations of this Code. It may request reports from the Company's executive officers about the implementation of this Code and may take any steps in connection with the implementation of this Code as it deems necessary, subject to the limitations set forth in this Code. The Audit Committee will have the authority to review and assess this Code and recommend revisions for approval by the Board. The Company will notify directors of any material changes to this Code.

(Emphasis added.)

54.    In violation of the Code of Ethics, the Individual Defendants (as Mullen officers and/or as members of the Board) conducted little, if any, oversight of the Merger, the Company's business, and consciously disregarded their duties to monitor such dealings and protect corporate assets before and after closing the Merger. The Individual Defendants' complete failure to perform their duties in good faith resulted in misrepresentations to the investing public and the Company's shareholders, and in engagement in conduct that was not in the best interest of the Company.

## THE AUDIT COMMITTEE

55.     The purpose of the Audit Committee is to assist the Board in fulfilling its oversight responsibility relating to the integrity of the Company's financial statements and financial reporting process and its system of internal accounting and financial controls, including the following functions:

- reviewing and approving the engagement of the independent registered public accounting firm to perform audit services and any permissible non-audit services for the Company;
- evaluating the performance of our independent registered public accounting firm and deciding whether to retain their services;
- monitoring the rotation of partners on the engagement team of our independent registered public accounting firm;
- reviewing our annual and quarterly financial statements and reports and discussing the statements and reports with our independent registered public accounting firm and management, including a review of disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations";
- considering and approving or disapproving all related party transactions for the Company;
- reviewing, with our independent registered public accounting firm and management, significant issues that may arise regarding accounting principles and financial statement presentation, as well as matters concerning the scope, adequacy and effectiveness of our financial controls;
- conducting an annual assessment of the performance of the Audit Committee and its members, and the adequacy of its charter; and
- establishing procedures for the receipt, retention and treatment of complaints received by us regarding financial controls, accounting or auditing matters.

## THE AUDIT COMMITTEE CHARTER

56.     The Audit Committee Charter provides:

The responsibilities, duties and powers of the Audit Committee shall include:

– 22 –

**Review Procedures**

1. Reviewing the reports of management, internal audit and the independent auditors concerning the design, implementation and maintenance of the Company's internal controls and procedures for financial reporting, including meeting periodically with the Company's management, internal audit and the independent auditors to review their assessment of the adequacy of such controls and to review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and the attestations or reports by the independent auditors relating to such disclosure.

2. Reviewing and providing oversight of the external audit by:

     a. reviewing the independent auditors' proposed audit scope and approach.
     b. discussing with the Company's independent auditors the financial statements and audit findings, including any significant adjustments, management judgments and accounting estimates, significant new accounting policies, disagreements with management and any other required communications described in applicable accounting standards.
     c. reviewing with the independent auditors the Company's critical accounting policies and practices, alternative treatments of financial information within generally accepted accounting principles that have been discussed with management and the treatment recommended by the independent auditors, and other material written communications between the independent auditors and management.
     d. reviewing reports submitted to the audit committee by the independent auditors in accordance with applicable SEC requirements.

3. Reviewing and approving the annual internal audit project plan and any proposed changes and reviewing periodic reports summarizing results of the internal audit projects.

4. Reviewing and discussing with management earnings releases (with particular attention to any use of "pro forma" or "adjusted" non-GAAP

information), financial information and earnings guidance provided to the public, analysts and ratings agencies.

5. Reviewing and discussing with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC.

6. Recommending to the Board, if deemed appropriate, that the audited financial statements be included in the Company's Annual Report on Form 10-K, in accordance with the rules and regulations of the SEC.

7. Directing the Company's independent auditors to review before filing with the SEC the Company's interim financial statements included in Quarterly Reports on Form 10-Q, using professional standards and procedures for conducting such reviews.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

## FALSE AND MISLEADING STATEMENTS

## DURING THE RELEVANT PERIOD

*June 2020 Press Release*

57.     On June 15, 2020, the Company issued a press release entitled "Net Element Enters into a Letter of Intent to Merge with Electric Vehicle Company Mullen Technologies" (the "June 2020 Press Release") which announced the merger between Net Element and Mullen Technologies and stated the following, in pertinent part, regarding Mullen Technologies' ability and timeline to produce and sell automobiles:

Net Element, Inc. (NASDAQ: NETE) ("Net Element" or the "Company"), a global technology and value-added solutions group that supports electronic payments acceptance in a multi-channel environment including point-of sale ("POS"), e-commerce and mobile devices, announced today that it has entered into a binding Letter of Intent to merge with privately-held Mullen Technologies, Inc. ("Mullen"), a Southern California-based electric vehicle company in a

– 24 –

stock-for-stock reverse merger in which Mullen's stockholders will receive the majority of the outstanding stock in the post merger Company.

**Founded in 2014, Mullen expects to launch the Dragonfly K50, a luxury sports car, in the first half of 2021 through ICI (Independent Commercial Importers). Mullen currently has eight retail locations in California and one in Arizona.**

\*      \*      \*

According to Mullen, Mullen also owns several synergistic businesses including: Mullen Auto Sales, a fast-growing series of automobile dealerships and CarHub, a new and unique digital platform that leverages Artificial Intelligence (AI) and offers a complete, easy-to-use solution for buying, selling and owning a car. … The company has 15 patents or patents pending related to its electric vehicles technology, including nine in the United States.

**The Dragonfly K50 has been featured at the New York International Auto Show on April 2019**. The car also won the Governor's Choice Award at the 2019 Balboa Bay Club's Classic Auto Show. The K50 has also been the subject of stories in the Wall Street Journal, ABC News, Autoweek, MotorTrend and Forbes, among many other publications. A video of the launch of the car at the New York Auto Show can be seen here. … **Due to the COVID-19 pandemic, Mullen pushed the targeted date for ICI release of the Dragonfly K50 for 2nd quarter of 2021**.

\*      \*      \*

According to Mullen, Mullen has created a different business model to enter the EV market with core tenants that include: **fast-to-market**, highly efficient, ready and proven initial vehicle leveraging an existing vehicle produced internationally and designed to U.S. market needs (development reduced from 4 years to 17 months), and complemented with a portfolio of competitively priced vehicles (three platforms) in the fast-growing Electric SUV segment. According to Mullen, the first SUV Mullen expects to introduce will be the MX-05, a mid-size luxury SUV that will be featured as a battery electric vehicle.

– 25 –

[Image omitted.]

According to Mullen, ***due to launch in Q3-Q4 of 2021, the MX-05 represents Mullen Automotive's entry into the full-electric and range extender, luxury SUV market***. The MX-05 is expected to fit the Mid-Size SUV segment. ***Mullen projects for pre-launch to have several hundred units produced in 2021 and kickoff into full production in 2022.***

\*        \*        \*

**About Mullen Technologies**:
Mullen Technologies is a Southern California based ***licensed electric vehicle manufacturer with international distribution*** that operates in various verticals of businesses focusing in the automotive industry; Mullen Automotive, Mullen Energy, Mullen Auto Sales, Mullen Funding Corp., and Carhub. Each of these divisions provide Mullen with diversity of different products and services within the automotive industry. For more information, please visit: www.mullenusa.com.

(Emphasis added.)

58.     The June 2020 Press Release Defendant Michery stated the following regarding the Company's ability and timeline to produce and sell automobiles:

"We believe the timing of this merger is ideal for Mullen Technologies," said Mr. Michery. "***It comes on the preparation of our launch of the Dragonfly K50, which will be available in Q2 of 2021*** and through our retail network in California and Arizona and ***the development of a new EV model, the MX-05 Sport Utility Vehicle, that we expect the start of production next year*** …"

(Emphasis added.)

59.     The June 2020 Press Release also stated the following regarding the Company's dealings with other companies:

– 26 –

Founded in 2014, ***Mullen expects to launch the Dragonfly K50, a luxury sports car, in the first half of 2021 through ICI*** (Independent Commercial Importers). Mullen currently has eight retail locations in California and one in Arizona.

*    *    *

***Mullen is launching this car in conjunction with a cooperation agreement with Qiantu Motor***, a wholly-owned subsidiary of CH-Auto, a leading automotive design and manufacturing company in China.

(Emphasis added.)

60.    The June 2020 Press Release also stated the following regarding Mullen's battery technology and capabilities: "In addition, becoming public at this time ***should allow us to accelerate the development of our unique battery technology which I nonflammable, puncture proof, capable of maintaining full capabilities after 500,000 cycles, and is synthetic, requiring no mining of natural resources***." (Emphasis added.)

61.    The June 2020 Press Release also quoted Defendant Firer stating the following, in pertinent part, regarding Net Element's due diligence into Mullen Technologies:

"We feel, ***after considering an array of strategic alternatives, that the agreement with Mullen provides our shareholders with the most compelling opportunity***," said Oleg Firer, Net Element's Chairman and Chief Executive Officer. "***We conducted an extensive search of companies that have disruptive technologies, and believe that Mullen represents the best path forward***. We expect that the merger wit Mullen will create a new path forward that should reward our long-time shareholders."

(Emphasis added.)

– 27 –
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

62.     The June 2020 Press Release is false and misleading regarding the Company's ability and timeline for production of vehicles, its deals with business partners such as Qiantu, its battery technology and capabilities, its ability to sell branded products, its lack of proper due diligence, and that the Dragonfly K50 was not solely delayed due to the COVID-19 pandemic.

*December 2020 Press Release*

63.     On December 15, 2020, the Company issued a press release entitled "NETE: Q3 2020 Revenues Improve Despite Continued Shutdowns in NY and California" which reported the following regarding its due diligence into Mullen Technologies and Mullen Technologies' ability and timeline to produce and sell automobiles:

> **Update on Mullen Technologies Transaction**
> ***Net Element is still diligently working on completing the transaction with Mullen Technologies. Mullen is still in process of an audit and the S-4 document is being drafted.*** We expect to see it filed by year-end.
>
> Mullen Technologies itself has been progressing on its plans to sell and produce electric vehicles in the US. It started on construction of its pilot manufacturing facility in October and started also taking pre-orders on its $55,000 MX-05 fully electric SUV then. It is repurposing its high voltage battery R&D center as a pilot facility for its line of SUVs. The construction is planned for completion by April 2021 and we have no information that that timeline has changed. There ***the MX-05 SUVs will be assembled to be delivered to customers by the second quarter of 2022***. The facility is designed to assemble as many as a thousand SUVs annually with other models possible later. The company said it plans to hire 100 people to assemble the SUV, the battery, conduct R&D, and provide warehousing. Once completed the plant will build prototypes that will we used to get government approval and certification, a process that should take 16 months. After that, the company could begin deliveries to consumers. ***Customers can also pre-order the imported Dragonfly K50 super sports car from Mullen*** [sic]

– 28 –

**About Mullen Technologies:**

Mullen Technologies is a Southern California-based *licensed vehicle manufacturer* that operates in various verticals of the businesses, focusing in the automotive industry: Mullen Automotive, Mullen Energy, Mullen Auto Sales, Mullen Funding Corp. and CarHub. Each of these divisions provide Mullen with diversity of different products and services within the automotive industry. For more information, please visit: www.MullenUSA.com.

(Emphasis added.)

64.     The December 2020 Press Release is false and misleading regarding the Company's ability and timeline for production of vehicles, its deals with business partners such as Qiantu, its battery technology and capabilities, its ability to sell branded products, its lack of proper due diligence, and that the Dragonfly K50 was not solely delayed due to the COVID-19 pandemic.

*July 27, 2021 Proxy Statement*

65.     On July 27, 2021, the Company filed with the SEC a proxy statement on Schedule 14A pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[2] The Proxy Statement was filed in connection with a special meeting of shareholders to vote on conditions necessary to effectuate the merger of Net Element and Mullen Technologies.

---

[2] Plaintiff's allegations with respect to the misleading statements in the Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

66.     The Proxy Statement included a letter to shareholders from Defendant Firer.

67.     The Proxy Statement solicited Net Element shareholders to vote in the affirmative, stating that: **"THE NET ELEMENT BOARD RECOMMENDS THAT NET ELEMENT STOCKHOLDERS VOTE 'FOR' THE APPROVAL OF THE MERGER AGREEMENT PROPOSAL."**

68.     The Proxy Statement purportedly explained the Company's due diligence into Mullen Technologies and touted Mullen Technologies by stating the following, in pertinent part:

**Strength and Strategy**

● *Experienced and proven team in the Electric Vehicle ("EV") space.* The executive team at Mullen has extensive experience in the automotive OEM space. ***They have a detailed understanding of the product development cycle from blank sheet to post launch activities in both the high and low volume segments*** – knowing the different economies of scale which is vital to creating a high-quality profitable product. ***The team brings to Mullen expertise in studio design, engineering, manufacturing, energy storage systems, market analysis, corporate development, strategic planning and investment strategies.***

● *Design.* Mullen's platform architecture creates the opportunity for vehicles with unique aspect ratios - low roof line, wide track width, svelte body, long wheelbase, and a non-traditional battery layout. Mullen plans to bring a premium interior to the entry luxury price point in this EV segment. Recent models in the current EV segment come with premium cost, but with sub-premium interior finishes.

● *Unique plan.* ***Mullen's approach is a quick to market, lower capital investment compared to other startup EV companies.*** Mullen's plan includes launch in 36 months from program start while keeping expenditures lower by utilizing strategic partnerships in engineering and manufacturing. ***Mullen believes its battery technology will eventually allow it to deliver our high voltage batteries under $100 per kWh and over two times the energy density of current commercially available lithium batteries. Mullen anticipates the***

– 30 –

***batteries used in its cars will be able to withstand extreme abuse testing, which Mullen believes should make them safer than other commercially available lithium batteries. Mullen plans to utilize a more environmentally sustainable chemistry that does not have a high content of rare precious materials.*** Mullen intends to focus on $CO_2$ reduction in those critical aspects of its organization such as manufacturing facilities, R&D facilities, work policies, allowable materials, component tooling, and supply chain and logistics.

*     *     *



(Emphasis added.)

69.    The Proxy Statement contained several risk factors relating to the Merger. These risk disclosures, however, were inadequate as they merely listed potential issues, without discussing the severe, ongoing issues at Mullen Technologies. The Proxy Statement was materially false and misleading because it failed to state Mullen Technologies' (which would become Mullen's) severe issues regarding its ability and timeline for production of vehicles, its deals with business partners such as Qiantu, its battery technology and capabilities, its ability to sell branded products, its lack of proper due diligence, and that the Dragonfly K50 was

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

not solely delayed due to the COVID-19 pandemic. Accordingly, the Individual Defendants used the Proxy Statement to improperly solicit shareholder approval on the conditions needed ratification for the Merger to be complete, without giving shareholders all necessary information.

*November 2021 Press Release*

70.     On November 15, 2021, the Company issued a press release entitled "Important milestone in the company as the hiring ramp-up begins for skill trades and support staff" which stated the following, in pertinent part, regarding Mullen's production ability and timeline:

> Mullen Automotive, Inc. (NASDAQ: MULN) ("Mullen" or the "Company"), an emerging electric vehicle ("EV") manufacturer, is pleased to announce today that the company closed purchase of the Tunica, Mississippi, Advanced Manufacturing and Engineering Center (AMEC) without any debt and will begin ramp-up of hiring for the initial set of skilled trades and support staff. AMEC is in Robinsonville, Mississippi, which is located in Tunica County and is approximately 40 miles south of Memphis, Tennessee.
>
> **Mullen's previously announced plans on Nov. 5 to build out another 1.2 million square feet of manufacturing space to support class 1 and class 2 EV cargo vans and the Mullen FIVE EV Crossover at AMEC**. The facility currently occupies 124,000 square feet of manufacturing space. The total available land on the property is over 100 acres. On the expanded site, Mullen plans to build a body shop, a fully automated paint shop, and a general assembly shop.
>
> Mullen's commitment to the facility is strong and growing with hiring ramp-up now beginning for initial workers to support the initial preproduction build of class 1 and class 2 EV Cargo Vans.
>
> "This is a milestone for Mullen," stated David Michery, CEO and chairman of Mullen Automotive. "We now own this facility free and clear, with no associated debt or financial obligations on the property.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

AMEC is a tremendous asset for the company, and we are proud to begin hiring and build-out of the Tunica facility."

(Emphasis added.)

71.    The November 2021 Press Release is false and misleading regarding the Company's ability and timeline for production of vehicles, its deals with business partners such as Qiantu, its battery technology and capabilities, its ability to sell branded products, its lack of proper due diligence, and that the Dragonfly K50 was not solely delayed due to the COVID-19 pandemic.

*February 2022 Press Release*

72.    On February 28, 2022, the Company issued a press release entitled "EV Manufacturer Mullen Announces Progress on Solid-State Polymer Battery Pack Development" (the "February 2022 Press Release") which stated the following, in pertinent part, regarding its battery technology and capabilities and also its deals with business partners:

Data collected from solid-state cell testing shows impressive results, including a range of 600-plus miles on a full charge and over 300 miles of range delivered in 18 minutes with DC fast charging. Solid-state polymer batteries are slated for the second generation of the Mullen FIVE EV Crossover.

… Mullen Automotive, Inc. (NASDAQ: MULN) ("Mullen" or the "Company"), an emerging electric vehicle ("EV") manufacturer, announces an update on Mullen's next-generation solid-state polymer battery technology, which is a significant advancement over today's current lithium-ion batteries.

***Mullen's testing of solid-state polymer cells reveals the potential for a 150-kilowatt-hour battery pack that delivers over 600-plus miles of range and highlights an 18-minute DC fast charge which can yield over 300 miles of range***. Mullen is working towards utilizing solid-state polymer battery packs in its second generation Mullen FIVE EV

– 33 –

Crossovers, with in vehicle prototype testing set for 2025. Mullen's first-generation FIVE EV Crossover, due in late 2024, is planned to launch with traditional lithium-ion cell chemistry.

***Mullen is also conducting extensive research and development into other advanced battery technologies, including lithium-sulfur and lithium ironphosphate***. Mullen's ultimate goal is to deliver EV batteries that will surpass today's existing lithium-Ion technology and offer a host of benefits such as increased efficiency, energy density, and range while also lowering the cost, weight, thermal and environmental risks.

*    *    *

***Mullen has recently announced a string of key partnerships with hofer powertrain, Comau, ARRK, Dürr, and DSA Systems for EV powertrain, engineering, manufacturing, vehicle production systems, and over-the-air (OTA) and vehicle system diagnostics, respectively.*** The Company expects these strategic developments to play a crucial role in bringing the FIVE to market with the latest technology and in the shortest amount of time.

(Emphasis added.)

73.     In the February 2022 Press Release, Defendant Michery stated the following regarding the Company's battery technology and capabilities:

"We've conducted successful testing and will begin pack level development next," said David Michery, CEO and chairman of Mullen Automotive. "***The test data collected shows an impressive outcome and future for solid-state batteries***. To sum up, we tested our 300 Ah (ampere-hour) cell which yielded 343 Ah at 4.3 volts, and ***the results surpassed all expectations. We can say with almost certainty that this technology, once implemented on the Mullen FIVE, will deliver over 600 miles of range on a full charge.*** The future is bright for Mullen Automotive."

(Emphasis added.)

74.     The February 2021 Press Release is false and misleading regarding the Company's ability and timeline for production of vehicles, its deals with business partners such as Qiantu, its battery technology and capabilities, its ability to sell branded products, its lack of proper due diligence, and that the Dragonfly K50 was not solely delayed due to the COVID-19 pandemic.

*March 17, 2022 Tweet*

75.     On March 17, 2022, the Company tweeted the following, touting its battery technology and capabilities:

> #MullenAutomotive featured on Yahoo Finance Live! 📈 ***$MULN was identified as a standout that is doing well among falling #EV stocks due to its solid-state battery technology*** and strong domestic presence. #ElectricCars #MullenFIVE #GreenTechnology
>
> [Image omitted.]
>
> (Emphasis added.)

76.     The March 17, 2022 Tweet is false and misleading regarding the Company's ability and timeline for production of vehicles, its battery technology and capabilities, its ability to sell branded products, without discussing the ongoing issues.

## THE TRUTH BEGINS TO EMERGE

77.     On April 6, 2022, market analyst Hindenburg Research released a report regarding the Company entitled "Mullen Automotive: Yet Another Fast Talking EV Hustle" which detailed several alleged issues with the Company (the "Hindenburg Report").

78.     The Hindenburg Report stated the following, in pertinent part, regarding Mullen's production ability and timeline:

• Mullen is an aspiring EV manufacturer that came public in late 2021 via reverse merger. It has yet to produce a sellable vehicle. …

• Recently, Mullen shocked the market by claiming it would begin manufacturing 2 models of electric vans within months for an unnamed "major, major Fortune 500 customer". The news sent its stock up ~35% intraday.

• The 2 electric cargo vans that Mullen claims it will be manufacturing are actually Chinese EVs rebranded with a Mullen logo. Import records show the company recently imported 2 vehicles from China, one of each model.

\*       \*       \*

**Mullen's Vehicle Offering #3: The Mullen FIVE, a Compact SUV The Company Aspires to Develop, Manufacture and Deliver by The End of 2024**

The Mullen FIVE is pitched on the company's website as a "premium compact sport utility electric vehicle" that was "born out of [Mullen's] love" for California. The company says it is "designed, engineered, and manufactured entirely in the USA".

[Image omitted.]

In 2021, Mullen reported only $3 million in R&D expenditures, which consisted "primarily" of Mullen FIVE EV show car development by "employees and consultants".

We estimate that the company would likely need billions in capital to launch the FIVE, given that Mullen proposes to essentially build the vehicle and retool/build a manufacturing facility from the ground up in order to mass-produce the vehicle.

The company has barely made any progress toward this massive goal, acknowledging in its recent annual report that it is still negotiating with various manufacturing integration companies to assist in all aspects of design and development of a facility.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Nonetheless, Mullen said it hopes to complete its manufacturing facility by Q1 of 2024, and have a sellable Mullen FIVE 9 months later, by the 4th quarter of 2024.

*      *      *

**Location #4 - Tunica, MS (November 2021)**

**The Plant Was Previously Tooled to Build a Pizza Delivery Car, But Its Prior Owners Never Managed to Sell a Single Vehicle**

**Mullen Originally Said The 134,700 sq/ft Facility Would Serve as A Pilot Plant. But With Its Memphis Plans Abandoned, Mullen Claims It Intends to Expand the Plant by an Additional 1.2 Million sq/ft, With No Details On Bow This Will Even Be Physically Possible**

According to the Mississippi State Auditor, Greentech's electric car plant closed "before it ever produced a car quoted the state auditor as saying." An article quoted the state auditor as saying:

"On the day when they cranked up those energy-efficient electric cars and blue smoke bellowed out, you knew that this was a sham from the very beginning."

*      *      *

Other media, citing federal documents, said Greentech may have produced a total of 25 vehicles at the Tunica plant, but not a single one was reportedly sold.

**Mullen Claims Its Former Pizza Car Manufacturing Facility in Mississippi Is Stocked with State-of-the-Art Equipment and Machinery**

**But Pictures and Video of the Facility Show It Has Limited Equipment**

– 37 –

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

***The Company's Website Features One Photo of Advanced Manufacturing Equipment. We Found That It Was a Stock Photo***

Mullen Automotive calls the Tunica, Mississippi facility Its Advanced Manufacturing Engineering center (AMEC). The company states that "AMEC is fully tooled with state-of-the-art equipment and machinery."

Given Greentech's limited history of production, it is not clear how much assembly line equipment was ever installed nor how much was in place when the Tunica plant was shuttered.

However, a 2017 review by the Mississippi State Auditor mentioned assembly equipment and car parts offered as loan collateral by Greentech amounting to only $3.4 million. It is not clear if that was the total value of assembly equipment at the factory when Greentech went bankrupt.

Mullen's website has a brief video that shows the interior of the factory. It looks to have storage space, tables and chairs for employees, and several lifting cranes. It does not appear from the video that there are any assembly lines, or robotic manufacturing machines.

[Image omitted.]

However, Mullen's website does feature one picture that shows advanced manufacturing robots. An online search shows that it's a stock photo, which appears to have been purchased from Adobe stock images.

– 38 –



*Source: Mullen's website* (http://www.mullenusa.com/manufacturing)



*(Source: Adobe Stock Photos* (https://stock.adobe.com/494146009))

(Emphasis added.)

79.     The Hindenburg Report stated the following, in pertinent part, regarding Mullen's dealings with Qiantu:

• In 2019, the Mullen Dragon Fly was revealed as a supercar built by Chinese manufacturer Qiantu Motors and was meant to be rebranded and sold by Mullen starting in 2020. ***Following the reveal, Mullen immediately defaulted on its payment obligations to Qiantu, leading to termination of the agreement in October 2019.***
• Mullen continued to market the vehicle as its own. ***In legal documents, Qiantu alleges this is "an inexcusable misuse of Qiantu's own intellectual property". Despite the termination of the agreement, Mullen to this day still says the Dragon Fly is "Coming Soon" on its website and is soliciting $1,000 reservations for the vehicle.***

– 39 –

• For its other proposed vehicle, an electric SUV, Mullen previously announced it received an order for 10,000 vehicles, representing $500 million in potential revenue. We called the South Florida contractor firm that placed the order. It currently has only around 11 vehicles, none of which are electric.

(Emphasis added.)

80.     The Hindenburg Report stated the following, in pertinent part, regarding Mullen's battery technology and capabilities:

• The company's stock has spiked ~316% in the past couple of months driven by retail investor euphoria over bold claims of ground-breaking technology, near term production of its EV vans, and a major as-yet-unnamed Fortune 500 customer.
• Despite only spending ~$3 million in R&D in 2021, Mullen claims its solid-state battery technology is on track for commercialization in 18 to 24 months, putting it head of every major technology and automaker in the industry who have collectively invested billions on solving the problem.
• Mullen recently press released an update on its battery testing, sending its stock soaring 145% in a day. In reality, the "news" appears to be a rehash of testing the company had already announced in 2020.
• Mullen apparently misrepresented the test results, according to the CEO of the company that performed the tests. Its CEO told us of Mullen's press release: "We never would have said that. We never did say it and certainly wouldn't have said it based on the results of testing that battery.

                    *          *          *

With only $360 (numbers *not* in thousands) in unrestricted cash as of December 31st, 2021, nearly $19 million in near-term debt, $48.4 million in current liabilities and consistent operating losses, the company seemed to be teetering on insolvency right out of the gate.

Then, on February 28th, 2022 the company made a surprising announcement. Despite spending only $3 million in R&D during its

entire fiscal 2021, Mullen claimed it had made progress and "significant advancement'" on development of solid-state batteries, a widely regarded "holy grail" of the EV battery industry that has long-eluded tech and automaker giants such as Panasonic and Volkswagen. The stock rallied ~145% on the day.

* * *

## Part I: Mullen's Bold Claims of Being on the Cusp of Revolutionizing the Solid-State Battery Market

### Mullen's Claims About Its Solid-State Battery Development Would Put It Ahead of Every Major Automaker, Which Have Collectively Invested Billions into The Technology

The auto industry is collectively investing billions into developing solid-state battery technology. Given Mullen's tiny 2021 R&D budget of $3 million, which it acknowledged mainly went toward building show cars, we found its claims to have ground-breaking solid-state battery tech to be exceedingly implausible.

In a January 28th, 2022, interview Michery claimed Mullen was on track to commercialize solid-state
polymer batteries in the next 18 to 24 months, putting it well ahead of every other major automaker working on this critical industry issue.

By comparison, solid-state technology developer Quantumscape has a cumulative $1.2 billion in order to develop solid-state battery technology, with $300 million coming from Volkswagen. The company said it aims to commercialize production in 2024-2025.

Other major auto companies have later targets. Toyota has thousands of patents in the solid-state battery field with its partner Panasonic, and aims for deployment in 2025. Mercedes aim to introduce their solid-state technology by 2027 and 2026 respectively, while Nissan and BMW aim to produce it by 2028 and 2030, respectively. Other major automakers like GM, Ford and Hyundai have all announced major investments or partnerships in solid-state technology without clear timelines for production.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

\*       \*       \*

**Mullen's Battery Claims Were Based on Technology Licensed from A Newly Formed Chinese Battery Technology Company Called Linghang Boao**

***Mullen Made Only One $390,000 Payment Under Its Licensing Deal. It Then Announced the Importance of the Relationship Around Its Go-Public Merger, Then Promptly Then Terminated the Deal***

**Lingbang Boao's Websites No Longer Work**

In November 2019, Mullen entered into a three-year Strategic Cooperation Agreement ("SCA") with Linghang Boao Group Ltd to co-develop a solid-state battery management system with a 480-720-mile driving range.

The Company's total financial commitment under the agreement was $2,196,000. On December 3, 2019, the Company paid the first installment of $390,000. It would be the only payment made in the agreement.

Linghang Boao was registered in China in November 2018, just one year before its agreement with Mullen, according to Chinese corporate records. It shares a cell phone number with at least 99 other companies and listed its address inside a high-rise building (not a factory).

Its U.S. website just 9 months prior to its agreement with Mullen, no longer works. Nor does its Chinese website. An online slide deck about the company, uploaded 2 years ago, claims it "has been continuously breaking through in the field of power and energy storage batteries".

Nonetheless, the agreement with Linghang Boao seemed to serve as the foundation for Mullen's bold battery claims. During its announced go-public merger on June 15 2020 Mullen said:

"... becoming public at this time should allow us to accelerate the development of our unique battery technology which is non-flammable,

– 42 –

puncture proof, capable of maintaining full capabilities after 500,000 cycles, and is synthetic, requiring no mining of natural resources."

Just months later, around September 2020, Mullen terminated the relationship, claiming that COVID was a force majeure event.

**Our Overall Take: Mullen's Battery Tech Claims Are Smoke And Mirrors**

***We think Mullen has severely and repeatedly misled investors on its claimed battery technology.*** Its latest iteration of its battery story is an agreement with Nextech Batteries, a small Nevada-based R&D firm with about 17 employees on LinkedIn.

We spoke with Nextech's CEO, Bill Burger, and found him to be straightforward about the stage of his technology. He explained that while they are optimistic, they are presently in the prototype and R&D phase, and aiming to secure financing in order to build out a manufacturing facility, continue testing, and move toward higher volume.

***We suspect that Mullen is once again attempting to borrow credibility from others in order to make grandiose claims to investors, pitching aggressive short-term timelines that bear little resemblance to reality.***

(Emphasis added.)

81.   The Hindenburg Report stated the following, in pertinent part, regarding Mullen's ability to sell its branded products:

• Mullen has other major production hurdles. ***The company has no EPA certificates for its vans (nor any vehicle), a requirement to sell vehicles in the U.S. that often takes 12-18 months.*** It has only a handful of job openings for its plant, and hasn't begun significant hiring, according to the President of the Tunica County Chamber of Commerce. …

– 43 –

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

• Mullen's plant in Tunica Mississippi was previously tooled to build a pizza delivery car, but prior owners never managed to sell a single vehicle.

• Mullen originally said the 124,700 sq/ft facility would serve as a pilot plant, but after abandoning several other plant projects, Mullen now claims it intends to expand the plant 1 Ox, or an additional 1.2 million sq/ft, with no details on how this will even be physically possible.

• *Mullen claims its former pizza car manufacturing facility in Mississippi is stocked with state-of-the-art equipment and machinery, but photos and video of the facility show it has limited equipment.*

• *Mullen's website features one photo of advanced manufacturing equipment. we found that it was a stock photo which appears to have been purchased from Adobe stock images.*

\*    \*    \*

*Despite having a limited staff of just 44 full-time employees as of 2021 fiscal year-end, Mullen announced that it would imminently begin manufacturing electric vans for an unnamed Fortune 500 customer.* The prospect of near-term revenue and a major, credible customer resulted in an immediate 35% intraday stock spike.

\*    \*    \*

*The Reality On The Ground Seems to Starkly Differ From Mullen's Claims of Imminent Production*

*The Company Has No EPA Certificates for Its Vans (Nor Any Vehicle), A Requirement to Sell Vehicles in The U.S. That Often Takes 12-18 Months*

**Furthermore, Mullen Hasn't Begun Significant Hiring for Its Plant, According to The President of The Tunica County Chamber of Commerce**

Even if Mullen does choose to surreptitiously import and/or assemble and rebrand Chinese vehicles, additional hurdles prevent its claimed near-term U.S. customer deliveries.

– 44 –

*According to the EPA website neither Mullen, Tenglong nor DFSK have certificates required to sell vehicles in the U.S. We also checked with the EPA press office who wrote us they had received no certificate applications for any Mullen vehicles.*

*The EPA makes it clear these certificates are compulsory*:

"A Certificate of Conformity is the document that EPA issues to a vehicle manufacturer to certify that a vehicle class conforms to EPA requirements. Every class of motor vehicle introduced into commerce in the United States mug have a Certificate of Conformity. Certificates are valid for only one model year of production."

We consulted an Independent Commercial Importer (ICI), one of 6 entities that have obtained official EPA credentials to legally import vehicles into the United States, about how long it could take Mullen to obtain certificates of conformity for Chinese passenger vehicles and light vans. A representative for the ICI told us:

"Cost and time to be determined - after inspection average 12 to 18 months."

According to experts we consulted, in order to qualify, vehicles must go through crash testing and inspections. Vehicles sold in Europe or China must often be reworked to suit the safety requirements of the U.S. market, such as adding airbags, changing belts, and modifying wheels and other components. …

All vehicles sold in the U.S. must also comply with Federal Motor Vehicle Safety Standards (FMVSS) testing required by the NHTSA. Mullen has yet to disclose whether its vans have begun this process, let alone satisfied these
criteria.

*        *        *

*Given that Mullen has no apparent EPA certificates, no apparent FMVSS testing and no apparent adequately staffed factory, we*

*estimate that the company is years away from ever delivering a vehicle should it actually take genuine steps to do so.*

\*         \*         \*

**Mullen's Vehicle Offering #2: The Mullen "DragonFly"**

**2019: The Mullen DragonFly Was Revealed as A Supercar Built by Chinese Manufacturer Qiantu Motors, Meant to Be Rebranded and Sold Through Mullen Starting in 2020**

Another of Mullen's key prospective product offerings is the DragonFly, a luxury sedan supercar manufactured by Qiantu out of China.

The vehicle, known as the Qiantu K50, was introduced in China in 2015. In December 2018, Mullen and Qiantu announced a cooperation agreement to "homologate and assemble cars in the us for sales in North America."

Mullen put its logo on the car and revealed it as the rebranded "DragonFly" to the U.S. market in April 2019 at the New York International Auto Show. …

*Following the Reveal, Mullen Immediately Defaulted on its Payment Obligations to Qiantu, Leading to Termination of the Agreement in November 2019*

**Yet Mullen Continued to Market the Vehicle as Its Own. In Legal Documents Qiantu Alleges This is "An Inexcusable Misuse of Qiantu's Own Intellec:taal Property"**

*Behind the scenes, the partnership quickly went south. Subsequent litigation records reveal that Mullen immediately defaulted on its obligations, missing its first payment to Qiantu to cover pre-launch costs.*

With an outstanding balance owed by Mullen to Qiantu of almost $23 million, Qiantu terminated the agreement in November 2019. It also

– 46 –

expressed surprise in its earlier Notice of Termination to Mullen that "Mullen could so badly miss the mark immediately out of the gate."

[Image omitted.]

Rather than acknowledge the end of the deal. Mullen continued to market the partnership as if it were ongoing, Qiantu alleged in legal documents. It even continued soliciting reservations for the vehicle, calling it the "Mullen K50" on social media posts.

\*       \*       \*

**Despite the Termination of The Agreement with Qiantu, Mullen Continued to Market the Offering, Including During Its Go-Public Period**

***To This Day, It Still Says the DragonFly Is "Coming Soon" On Its Website and Is Soliciting $1,000 Reservations for the Vehicle***

Despite the termination of the agreement and the ongoing dispute, the Dragon Fly has been continuously marketed by Mullen as an ongoing offering.

On June 15, 2020, 7 months after the Qiantu agreement had been terminated and had devolved into litigation, the press release announcing Mullen's go-public merger said:

"Mullen expects to launch the Dragonfly K50, a luxury sports car, in the first half of 2021"

Chairman/CEO Michery was then quoted as saying:

"[The merger] comes on the preparation of our launch of the Dragonfly K50, which will be available in Q2 of 2021."

***To this day, the DragonFly is featured on Mullen's website, which is currently soliciting reservations with a $1,000 deposit.***

[Image omitted.]

– 47 –

Other parts of the Mullen website claim the DragonFly Is "coming soon".

[Image omitted.]

In its most recent annual report, Mullen claimed to be pursuing the purchase of intellectual property rights relating to the K-50. Should it succeed, it would presumably need to figure out a way to actually manufacture the vehicle, a process we expect would not be "coming soon".

### Chinese Media Reports That Qiantu Ran into Financial Trouble Around 2020 And Halted Production of the K50

A closer look at the timing and subsequent collapse of the Qiantu-Mullen deal reveals a Chinese company that lacked finances to build the vehicle negotiating with an American company that didn't have the cash to buy it.

(Emphasis added.)

82.    On this news, Mullen's stock price fell $0.27 per share, or 10%, to close at $2.38 per share on April 7, 2022, on unusually heavy trading volume, damaging investors.

83.    As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## DAMAGES TO MULLEN

84.    As a direct and proximate result of the Individual Defendants' conduct, Mullen has expended and will continue to expend significant sums of money.

85.    Such expenditures include, but are not limited to, legal fees associated with the aforementioned Consolidated Securities Class Action filed against the

Company for violations of the federal securities laws. Mullen will incur additional expenditures and economic harm due to, among other things, amounts paid to outside lawyers, accountants, and investigators in connection with internal investigations, and payments associated with the aforementioned issues.

86. As a direct and proximate result of the Individual Defendants' conduct, Mullen has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE ALLEGATIONS

87. Plaintiff brings this action derivatively and for the benefit of Mullen to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Mullen, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act.

88. Mullen is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

89. Plaintiff is, and at relevant times has been, an Mullen shareholder. Plaintiff will adequately and fairly represent the interests of Mullen in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

90. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

91. A pre-suit demand on the Board of Mullen is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following

seven individuals: Defendants Michery, Novoa, Winter, Puckett, Betor, and Miltner (collectively, the "Current Director Defendants"), along with Relevant Party John K. Andersen[3] . Plaintiff needs only to allege demand futility as to four of the seven members that are on the Board at the time this action is commenced.

92.     Defendant Michery has served as the Chairman of the Board, President and Chief Executive Officer of the Company since the closing of the merger with Net Element, Inc. on November 5, 2021, and held those same positions at Mullen Technologies, Inc. since its inception in 2018. His automotive experience began with the acquisition of Mullen Motor Company in 2012.

93.     Defendant Michery is not disinterested or independent, and therefore, is incapable of considering demand because Defendant Michery (as CEO) is an employee of the Company who derived substantially all of his income from his employment with the Company, making him not independent. As such, Defendant Michery cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence and financial benefits received by Defendant Michery renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

94.     Defendant Michery is also a defendant in the Consolidated Securities Class Action. Defendant Michery is not independent from Defendants Betor, New and Puckett, because they comprise the Mullen Compensation Committee and are responsible for evaluating and determining the compensation of the CEO (Defendant Michery). Because of his status as an inside director, and the

_____

[3] On September 16, 2022, the Board of Directors of Mullen Automotive Inc. appointed John K. Anderson as a Director, effective as of September 19, 2022.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

concomitant substantial compensation he receives, Defendant Michery could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future. *See, e.g.*, *Rales v. Blasband*, 634 A.2d 927, 937 (Del. 1993); *Steiner v. Meyerson*, 1995 WL 441999, at *10 (Del. Ch. July 19, 1995); *In re The Student Loan Corp. Derivative Litig.*, 2002 WL 75479, at *3 (Del. Ch. Jan. 8, 2002); *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 275 (S.D.N.Y. 2006) (applying Delaware law) (fact of director's deriving his principal income from employment by the corporation makes it improbable that he could perform his fiduciary duties without bring influenced by his overriding personal interest) (citing *In re General Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *8 (Del. Ch. May 4, 2005)).

95.    Defendant Michery has also provided loans to the Company. The outstanding balances for these loans as of March 31, 2021 and September 30, 2020 are $86,404 and $172,791, respectively.

96.    Defendant Michery, as the Chair of the Board, was responsible for the Company's operations, internal controls, and false and misleading statements and omissions during the Relevant Period. Defendant Michery received, and will continue to receive, handsome compensation for serving on Mullen's Board. Defendant Michery conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In complete abdication of his fiduciary duties, Defendant Michery either participated in or was recklessly unaware of the scheme to hide the conditions and abilities of Mullen. As a result, Defendant Michery breached his fiduciary duties. For these

reasons, Defendant Michery faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

97. Defendant Novoa and the Company entered into a one-year Consulting Agreement on January 12, 2022. Defendant Novoa was also issued an aggregate of 255,500 shares of Common Stock pursuant to the terms of the Consulting Agreement. Defendant Novoa is not disinterested or independent and is incapable of considering demand because Novoa is a paid consultant of the Company and derives substantial income from his employment with the Company, making him not independent.

98. Defendant Novoa received, and will continue to receive, handsome compensation for serving on Mullen's Board. Defendant Novoa conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In complete abdication of his fiduciary duties, Defendant Novoa either participated in or was recklessly unaware of the scheme to hide the conditions and abilities of Mullen. As a result, Defendant Novoa breached his fiduciary duties. For these reasons, Defendant Novoa faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

99. Defendant Winter has served as Director of the Company since the closing of the Merger and served as a Director of Mullen Technologies since 2018. Defendant Winter has been an integral part of Mullen since inception.

100. Defendant Winter and the Company entered into a Consulting Agreement on October 26, 2021 whereby the Company has agreed to pay Winter $60,000 for the period from October 1, 2021 to September 30, 2022 for her services as corporate secretary and director. Defendant Winter is not disinterested or

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

independent and is incapable of considering demand because Winter is a paid consultant of the Company and derives substantial income from her employment with the Company, making her not independent.

101.   Defendant Winter currently serves as the Secretary of the Company and Board of Directors. Formerly, Defendant Winter was the Vice President of Operations for Mullen Technologies since 2014.

102.   Defendant Winter received, and will continue to receive, handsome compensation for serving on Mullen's Board. Defendant Winter conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. In complete abdication of her fiduciary duties, Defendant Winter either participated in or was recklessly unaware of the scheme to hide the conditions and abilities of Mullen. As a result, Defendant Winter breached her fiduciary duties. For these reasons, Defendant Winter faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

103.   Defendant Puckett has served as a Director of the Company since the closing of the Merger. Defendant Puckett has served on Mullen Technologies' Board since 2018, serving as the Audit Committee Chair during that time. Previously, he served as the Chief Financial Officer of Mullen Technologies from 2012 to 2018.

104.   Defendant Puckett received, and will continue to receive, handsome compensation for serving on Mullen's Board, sitting on the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee. Defendant Puckett conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his

duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In complete abdication of his fiduciary duties, Defendant Puckett either participated in or was recklessly unaware of the scheme to hide the conditions and abilities of Mullen. As a result, Defendant Puckett breached his fiduciary duties. For these reasons, Defendant Puckett faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

105.   Defendant Betor has served as a Director of the Company since the closing of the Merger and served as a Director of Mullen Technologies since 2018.

106.   Defendant Betor received, and will continue to receive, handsome compensation for serving on Mullen's Board, sitting on the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee. Defendant Betor conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In complete abdication of his fiduciary duties, Defendant Betor either participated in or was recklessly unaware of the scheme to hide the conditions and abilities of Mullen. As a result, Defendant Betor breached his fiduciary duties. For these reasons, Defendant Betor faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

107.   Defendant Miltner has served as a Director of the Company since the closing of the Merger.

108.   Defendant Miltner received, and will continue to receive, handsome compensation for serving on Mullen's Board, and sitting on the Nominating and Corporate Governance Committee. Defendant Miltner conducted little, if any,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In complete abdication of his fiduciary duties, Defendant Miltner either participated in or was recklessly unaware of the scheme to hide the conditions and abilities of Mullen. As a result, Defendant Miltner breached his fiduciary duties. For these reasons, Defendant Miltner faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused

109.   Further, as a result of the prior business relationships at Mullen Technologies among Defendants Michery, Winter, Puckett, and Betor, they are unable to evaluate a demand with independence, and therefore, demand is excused.

110.   Professional or personal friendships raises a reasonable doubt whether these directors can appropriately consider demand. Likewise, substantial past or current relationships of a business nature may, if material to the director, give rise to a pleading-stage inference of beholdenness.

111.   Demand is excused as to all of the Current Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the aforementioned conduct, which renders them unable to impartially investigate the conduct and decide whether to pursue action against themselves and the other perpetrators of the conduct.

112.   In complete abdication of their fiduciary duties, all of the Director Defendants either participated in or were recklessly unaware of the conduct to make the Company appear more attractive to investors, and to increase the Company stock price. As a result, the Director Defendants breached their fiduciary duties.

Thus, the Current Director Defendants face a substantial likelihood of liability, and demand upon them is futile.

113.   The Director Defendants, as members of the Board and employees as applicable, were and/or are subject to the Code of Ethics. The Code of Ethics required the Director Defendants to adhere to the Company's standards of business conduct. The Director Defendants did not comply with the requirements of the Code of Ethics. The Director Defendants violated the Code of Ethics. Because the Current Director Defendants violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

114.   Furthermore, demand in this case is excused because the Current Director Defendants, who are named as defendants in this action and who may be the subject of investigations of the Consolidated Securities Class Action and even federal and state law enforcement agents or others, control the Company and are beholden to each other.

115.   Members of the Board have (often longstanding) business and personal relationships with each other that precludes them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Board from adequately monitoring the Company's operations and potential combinations and calling into question the Individual Defendants' conduct. Thus, any demand on the Current Director Defendants would be futile.

116.   Mullen has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Current Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Mullen any part of the damages

Mullen suffered and will continue to suffer thereby. Thus, any demand on the Current Director Defendants would be futile.

117.   The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgments as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As the Current Director Defendants face a substantial likelihood of liability, they are self-interested in the actions and inactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

118.   The acts complained of herein constitute violations of fiduciary duties owed by Mullen's officers and directors and these acts are incapable of ratification.

119.   The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.,* monies belonging to the stockholders of Mullen. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, among other things, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Mullen, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Current Director Defendants is futile and, therefore, excused.

120.  If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Mullen to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

121.  Thus, for the reasons set forth above, all of the Director Defendants, and, if not all of them, certainly a majority of the Current Director Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Current Director Defendants is excused as futile.

122.  Overall, the Company has and will most likely expend substantial resources on internal investigations and defending the Consolidated Securities Class Action and any other related actions. The Company will also lose substantial sums of money due, among other things, related legal and regulatory costs. Moreover, the Company's reputation has been severely damaged. The Company has also wasted a substantial amount of money in compensating the Individual Defendants as directors and officers. Mullen's prospect of raising equity in the future is weakened. All of this substantial damage stems proximately from the Individual Defendants' conscious and willful breaches of their fiduciary duties, abuse of control, waste of corporate assets, violations of Section 14(a) of the Exchange Act, and other malfeasance.

## **FIRST CLAIM**

### **Against the Director Defendants for Breach of Fiduciary Duties**

123.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

124.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Mullen's business and affairs.

125.   Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

126.   The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Mullen.

127.   In breach of their fiduciary duties owed to Mullen, the Individual Defendants willfully participated in misrepresentation of the Company's business operations and prospects, failed to correct the Company's public statements, and failed to properly oversee Mullen's business, rendering them personally liable to the Company for breaching their fiduciary duties.

128.   The Individual Defendants had actual or constructive knowledge that that they had caused the Company to improperly misrepresent its business operations, potential combination, and prospects and they failed to correct the Company's public statements. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Mullen's securities.

129.   The Individual Defendants had actual or constructive knowledge that that they had caused the Company to make material misrepresentations and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

omissions and to fail to maintain adequate internal controls. Defendants had actual knowledge of the issues at Mullen Technologies and Mullen. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Mullen's securities.

130.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

131.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Mullen has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

## SECOND CLAIM

### Against the Director Defendants for Abuse of Control

132.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

133.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Mullen, for which they are legally responsible.

134.   As a direct and proximate result of the Individual Defendants' abuse of control, Mullen has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Mullen has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## THIRD CLAIM

### Against the Director Defendants for Gross Mismanagement

– 60 –

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

135.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

136.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Mullen in a manner consistent with the operations of a publicly-held corporation.

137.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Mullen has sustained and will continue to sustain significant damages.

138.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

139.   Plaintiff, on behalf of Mullen, has no adequate remedy at law.

## **FOURTH CLAIM**

### **Against the Director Defendants for Waste of Corporate Assets**

140.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

141.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused the Company to waste valuable corporate assets by failing to disclose: (i) the Company's disclosure controls and procedures were not effective; and (ii) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times

142.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to

engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company.

143.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

144.   Plaintiff, on behalf of Mullen, has no adequate remedy at law.

## FIFTH CLAIM

## Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

145.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

146.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

147.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his or her name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

148.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time

– 62 –

and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

149.   Under the direction and watch of the Individual Defendant, the Proxy Statement failed to disclose, among other things, issues with Mullen Technologies regarding its ability and timeline for production of vehicles, its deals with business partners such as Qiantu, its battery technology and capabilities, its ability to sell branded products, its due diligence into Mullen Technologies, and that the Dragonfly K50 was not solely delayed due to the COVID-19 pandemic.

150.   As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

151.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statement, including, ratification of the conditions to lead to the consummation of the Merger.

152.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statement.

153.   Plaintiff on behalf of Mullen has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.   Declaring that Plaintiff may maintain this action on behalf of Mullen, and that Plaintiff is an adequate representative of the Company;

B.     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Mullen;

C.     Determining and awarding to Mullen the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

D.     Directing Mullen and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Mullen and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.     a provision to permit the shareholders of Mullen to nominate at least four candidates for election to the Board;

3.     a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations; and

5.     a proposal to increase the diversity of the Board, including diversity of gender and technical background.

E.     Awarding Mullen restitution from Individual Defendants, and each of them;

F.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

G.     Granting such other and further relief as the Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated: September 30, 2022                    Respectfully submitted,

                              **THE ROSEN LAW FIRM, P.A.**

                              <u>/s/Laurence M. Rosen</u>
                              Laurence M. Rosen, Esq. (SBN 219683)
                              355 S. Grand Avenue, Suite 2450
                              Los Angeles, CA 90071
                              Telephone: (213) 785-2610
                              Facsimile: (213) 226-4684
                              Email: lrosen@rosenlegal.com

                              *Counsel for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

DocuSign Envelope ID: 7GB7BCED-2781-4FC5-B77E-B38E1880BAD7

## **VERIFICATION**

I,   Hany Morsy   am   a   plaintiff in   the within   action. I have   reviewed   the   allegations   made   in   this   shareholder   derivative complaint,   know   the   contents   thereof,   and   authorize   its   filing.   To   those allegations   of which   I have personal   knowledge,   I   believe those   allegations   to be   true.   As to   those allegations   of which   I   do   not   have personal knowledge, I rely   upon   my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _th day of _____, 2022.

9/30/2022

Hany MORSY

87F56175E8044E5

Hany Morsy